**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SCOTT EHRLICH, SALVATORE REALE
and GARY PRUSINSKI, on behalf themselves
and others similarly situated,

      Plaintiffs,

                                   **CASE NO. 8:16-CV-03532-SCB-TGW**

v.

                                   **DEFENDANT'S MOTION FOR**
                                   **SUMMARY JUDGMENT**

RICH PRODUCTS CORPORATION,      **ORAL ARGUMENT REQUESTED**

      Defendants.               /

**DEFENDANT'S MOTION FOR SUMMARY FINAL JUDGMENT, STATEMENT OF
UNDISPUTED MATERIAL FACTS AND MEMORANDUM OF LAW**

      Defendant, RICH PRODUCTS CORPORATION ("Rich"), by and through its

undersigned counsel, hereby moves this Court as follows:

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Rich moves for

the entry of summary final judgment on grounds that the pleadings, depositions, discovery

responses and other evidence on file demonstrate that there is no genuine issue as to any material

fact and that Defendant is entitled to judgment as a matter of law.

      Defendant Rich also hereby moves the Court for an oral argument on its Motion for

Summary Final Judgment and states that it seeks 15 minutes to present its argument.

      In support of its motion Defendant hereby submits the following Statement of Undisputed

Facts and Memorandum of Law.

## INTRODUCTION

Plaintiffs' Complaint seeks compensation on behalf of the Named Plaintiffs and the Opt-in Plaintiffs[1] for alleged unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA").  The record establishes, however, that the Named Plaintiffs and Opt-In Plaintiffs are exempt from the overtime pay provisions of the FLSA by virtue of the Motor Carrier Act Exemption. 29 U.S.C. § 213 9b) (1).  Specifically, the undisputed facts reveal that Rich is a private motor carrier registered under DOT regulations and that the activities of the Named Plaintiffs and Opt-In Plaintiffs as Route Sales Representatives who drive trucks weighing over 10,000 pounds—and deliver perishable ice cream cakes and frozen desserts to grocery stores and retail outlets—directly affect the safety of motor vehicles in interstate commerce. Accordingly, given the application of the Motor Carrier Act Exemption that exempts these persons from the overtime pay requirements of the FLSA, summary final judgment should be entered as a matter of law in favor of Rich.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following sets forth the statement of Undisputed Material Facts in support of Defendant Rich's Motion for Summary Judgment, including citation to the record evidence, which are attached as Exhibits to its motion.[2]

### A. <u>Nature of Rich's Business and its Business Activities in Florida:</u>

1.    Rich Products Corporation is a manufacturer and distributor of food products to the food service, in-store bakery and retail marketplaces. (Affidavit of Shirley Barnes sworn to

---

[1] Phase I notices under the FLSA were sent by Plaintiffs' counsel to 30 persons. Of those 30 persons, there were eight persons who chose to opt in the FLSA collective action.  The Opt-In Plaintiffs are: James Scheidemantel, Anthony Rosa, August Eck, Gregory Potter, Manuel Lopez, Mark Wall, Michael Sanchez and Harry Fonseca.

[2] For ease of reference each fact is set forth in a separately numbered paragraph and is cited in this brief as follows: "SOF at ¶__."

on December 1, 2017 ("Barnes Aff."), Ex. 1 at ¶ 3).  Rich is headquartered in Buffalo, New York and conducts business worldwide, including throughout the United States and Canada.  *Id*.

2.      This lawsuit concerns the distribution in Florida by Rich of Carvel® ice cream cakes that are manufactured by Rich in New Britain, Connecticut as well as other frozen desserts manufactured at locations outside Florida.  (Barnes Aff., Ex. 1 at ¶ 4).

3.      Rich is registered as a private motor carrier that is governed by and complies with the Federal Motor Carrier Safety Regulations, which were administered by the United States Department of Transportation ("DOT"), and are now administered by the Federal Motor Carrier Safety Administration (hereinafter referred to as "DOT Regulations").  (Affidavit of Shawn Wolf sworn to on December 1, 2017 ("Wolf Aff."), Ex. 2 at ¶ 4.  *Accord,* Deposition of Plaintiff Scott Ehrlich taken on October 13, 2017 ("Ehrlich Dep."), Ex. 3 at p. 36, lns. 20-25; Deposition of Plaintiff Gary Prusinski taken on October 13, 2017 ("Prusinski Dep."), Ex. 4 at p. 19, ln. 23 to p. 20, ln. 2 and p. 20, lns. 7-11; and Deposition of Plaintiff Salvatore Reale taken on October 31, 2017 ("Reale Dep."), Ex. 5 at p. 30, lns. 14-25).

4.      Due to the perishable nature of the ice cream cakes and other frozen dessert products that are manufactured outside Florida, these products are shipped to Florida from Connecticut and other states where they are manufactured via refrigerated tractor-trailer trucks— all of which weigh over 10,000 pounds and travel on public highways.  (Wolf Aff., Ex. 2 at ¶ 5. *See also,* Ehrlich Dep., Ex. 3 at p. 19, ln. 25 to p. 20, ln. 1 and p. 44, lns. 14-19; Prusinski Dep., Ex. 4 at p. 31, lns. 9-19 and p. 32, lns. 1-11; and Reale Dep., Ex. 5 at p. 48, lns. 1-25).  The trucking companies hired by Rich are provided with instructions by Rich as to the time of pick up, the place of pick up and the time of delivery and place of delivery.  (Wolf Aff., Ex 2 at ¶ 6).

5. Rich provides lading instructions to the trucking companies that bring the ice cream cakes and frozen desserts from the place of manufacture to Florida that instruct the trucking companies to deliver these products to the Burris facility in Florida. (Wolf Aff., Ex 2 at ¶ 7). These ice cream cakes and frozen desserts are temporarily held at the Burris facility until being transported by Burris shuttle trucks to the delivery trucks operated by Plaintiffs. (Wolf Aff., Ex. 2 at ¶ 8). The Plaintiffs—who all hold or held commercial drivers' licenses when working for Rich—then deliver the ice cream cakes and frozen desserts by means of refrigerated trucks—all of which trucks weigh over 10,000 pounds—to grocery stores and other retail outlets. (Wolf Aff., Ex. 2 at ¶ 9 and Attachment A). The Named Plaintiffs all have admitted holding commercial driver's licenses when working for Rich and that their job duties included driving Rich's trucks to deliver the ice cream cakes and frozen desserts to grocery and other retail stores. (*See* Ehrlich Dep., Ex. 3 at p. 37, lns. 22-23; p. 40, ln. 22 to p. 41, ln. 22; p. 17, ln. 16 to p. 18, ln. 2; and p. 45, ln. 13 to p. 46, ln. 1; Prusinski Dep., Ex. 4 at p. 20, ln. 14 to p. 21, ln. 11; and Reale Dep., Ex. 5 at p. 32, lns. 4-23 and p. 56, lns. 1-7).

**B.  Plaintiffs' Employment with Rich:**

6. Plaintiff Scott Ehrlich is currently employed by Rich as a Route Sales Representative ("RSR") whose duties include the ordering, sales and delivery of ice cream cakes and frozen desserts to grocery stores and other outlets in Florida. (Ehrlich Dep., Ex. 3, (Ehrlich Interrogatory Answers)).

7. Plaintiff Scott Ehrlich holds a commercial drivers' license and is provided with safety training by Rich and also is required by Rich to comply with DOT Regulations as part of his duties. (Ehrlich Dep., Ex. 3 at p. 37, lns. 22-23; p. 43, lns. 8 to 22; and p. 34, lns. 9-25. *See also,* Wolf Aff., Ex. 2 at ¶ 10).

4

8.      Plaintiff Scott Erhlich delivers the ice cream cakes and frozen desserts by driving a refrigerated truck weighing over 10,000 pounds.  (Wolf Aff., Ex. 2 at ¶ 9 and Attachment A). Plaintiff Scott Ehrlich acknowledged that the ice cream cakes and frozen desserts he delivers are perishable.  (Ehrlich Dep., Ex. 3 at p. 19, ln. 25 to p. 20, ln. 1).

9.      Plaintiff Gary Prusinski was formerly employed by Rich as an RSR whose duties included the ordering, sales and delivery of ice cream cakes and frozen desserts to grocery stores and other outlets in Florida.  (Prusinski Dep., Ex. 4 (Prusinski Interrogatory Answers)).

10.      Plaintiff Gary Prusinski held a commercial drivers' license when he worked for Rich and was provided with safety training by Rich and also required by Rich to comply with DOT Regulations as part of his duties.  (Prusinski Dep., Ex. 4 at p. 20, ln. 14 to p. 21, ln. 2; p. 17, ln. 24 to p. 18, ln. 16; p. 19, lns. 5-8; p. 19, ln. 23 to p. 20, ln. 2; and p. 20, lns. 7-11.  *See also,* Wolf Aff., Ex. 2 at ¶ 10).

11.      When working for Rich, Plaintiff Gary Prusinski delivered the ice cream cakes and frozen desserts by driving a refrigerated truck weighing over 10,000 pounds. (Wolf Aff., Ex. 2 at ¶ 9 and Attachment A).  Plaintiff Gary Prusinski acknowledged that the ice cream cakes and frozen desserts he delivered were perishable and had a reasonably short shelf life.  (Prusinski Dep., Ex. 4 at p. 32, ln. 23 to p. 33, ln. 12; p. 33, 1ines 13-22).

12.      Plaintiff Salvatore Reale was formerly employed by Rich as an RSR whose duties included the ordering, sales and delivery of ice cream cakes and frozen desserts to grocery stores and other outlets in Florida.  (Reale Dep., Ex. 5, (Reale Interrogatory Answers)).

13.      Plaintiff Salvatore Reale held a commercial drivers' license when he worked for Rich and was provided with safety training by Rich and also required by Rich to comply with DOT Regulations as part of his duties.  (Reale Dep., Ex. 5 at p. 33, lns. 2-21; p. 35, ln. 1-3; p. 35,

lns. 12-25; p. 36, lns. 1-17; p. 36, lns. 14-17; p. 37, lns. 2-15; and p. 38, ln. 1 to p. 39, ln. 7.  *See also,* Wolf Aff., Ex. 2 at ¶ 10).

14.     Plaintiff Salvatore Reale delivered the ice cream cakes and frozen desserts by driving a refrigerated truck weighing over 10,000 pounds.  (Wolf Aff., Ex. 2 at ¶ 9 and Attachment A).  Plaintiff Salvatore Reale acknowledged that the ice cream cakes and frozen desserts he delivered were perishable and had a reasonably short shelf life.  (Reale Dep., Ex. 5 at p. 21, lns. 1-7; p. 21, lns. 8-12).

15.     The Plaintiffs' Complaint states that the additional persons whom they purport to represent are "similarly situated" to Plaintiffs.  (Complaint, Ex. 6 at ¶ 15).

16.     The Plaintiffs' Complaint also states: "Plaintiffs were engaged in interstate commerce during their employment with Defendant."  (Complaint, Ex. 6 at ¶ 13).

17.     The Plaintiffs' Complaint seeks overtime wages under the FLSA and related relief on grounds that Plaintiffs and the additional persons whom Plaintiffs purport to represent were "misclassified" as exempt from the FLSA overtime requirements. (Complaint, Ex. 6 at ¶ 9 and *passim).*

18.     The Plaintiffs and all persons whom they purport to represent were paid weekly salaries that complied with the salary requirements applicable to persons subject to the Motor Carrier Act Exemption under the FLSA.  (Wolf Aff., Ex. 2 at ¶ 11 and Attachment B (the Named Plaintiffs' Earning Statements for the three years preceding the filing of the Complaint in this action)).

**C.   Rich's Compliance with DOT Regulations Rendering Plaintiffs Exempt from FLSA Overtime Requirements:**

19.     Rich is required to register and is registered with the Federal Motor Carrier Safety Administration of the United States DOT.  (Wolf Aff., Ex. 2 at 12 and Attachment C which is a

copy of Rich's current DOT registration certificate).  As a registered private motor carrier,

Rich's trucks driven by Plaintiffs and its records are regularly inspected by the DOT.  (Wolf

Aff., Ex. 2 at ¶ 12).

20.     Plaintiffs testified that, while working for Rich, they conducted "walk around"

inspections of their trucks before commencing work each morning and after completing work at

the end of each day.  (Ehrlich Dep., Ex. 3 at p. 33, lns. 1-8; Prusinski Dep., Ex. 4 at p. 15, ln. 17

to p. 17, ln. 5; and Reale Dep., Ex. 5 at  p. 36, lns. 1-16).  Plaintiff Ehrlich also testified that he

was aware of random inspections by the DOT of Rich's trucks that delivered ice cream cakes and

frozen desserts to grocery stores and other retail outlets.  (Ehrlich Dep., Ex. 3 at p. 37, lns. 4-15).

21.     Rich requires that its Route Sales Representatives ("RSRs")—including the

Plaintiffs—comply with DOT regulations, including requiring that all RSRs employed in Florida

possess a commercial drivers' license in order to drive the trucks delivering the ice cream cakes

and frozen desserts to retail outlets in Florida and otherwise requiring the RSRs to comply with

the DOT transportation rules while working for Rich.  (Wolf Aff., Ex. 2 at  ¶ 13; *Accord,* Ehrlich

Dep., Ex. 3 at p. 37, lns. 22-23; p. 43, lns. 8 to 22; and p. 34, lns. 9-25; Prusinski Dep., Ex. 4 at p.

20, ln. 14 to p. 21, ln. 2; p. 17, ln. 24 to p. 18, ln.16; p. 19, lns. 5-8; p. 19, ln. 23 to p. 20, ln. 2;

and p. 20, lns. 7-11; and Reale Dep., Ex. 5 at p. 33, lns. 2-21; p. 35, ln. 1-3; p. 35, lns. 12-25; p.

36, lns. 1-17; p. 36, lns. 14-17; p. 37, lns. 2-15; and p. 38, ln. 1 to p. 39, ln. 7).

22.     Rich provides DOT instruction to its drivers on a regular basis, and schedules and

monitors the service hours of its drivers so that they are in compliance with the detailed hours of

service regulations governing drivers of vehicles in interstate commerce operations.  (Wolf Aff.,

Ex. 2 at ¶ 14).  Rich maintains all required DOT records evidencing such compliance and also

maintains a "driver qualification" file for each driver as required by the Motor Carrier Safety

Regulations.  *Id.*  Rich's RSRs also are required to submit to pre-hire physical examinations, as well as pre-hire and random drug and alcohol testing as required by DOT regulations.  *Id.*

23.     The Plaintiffs testified to being provided the required documents concerning drug and alcohol testing and DOT compliance at their depositions and acknowledged that they were required by Rich to comply with all DOT Regulations and that they in fact did comply with the DOT Regulations as part of their job duties.  (*See, e.g.,* Ehrlich Dep., Ex. 3 at p. 33, ln. 1 to p. 43, ln. 22; Prusinski Dep., Ex. 4 at p. 61, lns. 2-11; and p. 61, ln. 21 to p. 62, ln. 18; Reale Dep., Ex. 5 at p. 37, lns. 2-15; p. 38, lns. 2-15; and p. 38, ln. 24 to p. 39, ln. 7; and Ex. 7, Deposition Exhibits documenting compliance with DOT Regulations applicable to truck drivers engaging in interstate commerce).

24.     Thus, Plaintiffs and all persons whom they purport to represent were required by Rich to comply with and to meet all the requirements of the DOT Regulations applicable to persons driving trucks weighing over 10,000 pounds in interstate commerce.  (Wolf Aff., Ex. 2 at ¶ 15).

### D.   The Products Delivered by Plaintiffs Were Products that Remained in the Chain of Interstate Commerce from the Time of Manufacture to the Time of Delivery to the Retail Outlets served by Plaintiffs:

25.     Plaintiffs and the persons whom they purport to represent were called upon to deliver the ice cream cakes and frozen desserts manufactured and shipped from outside the State of Florida to grocery stores and other retail outlets that Plaintiffs served in Florida and there were no products delivered by the Plaintiffs that were manufactured in or originated in Florida.   (Wolf Aff., Ex. 2 at ¶ 16; *See also,* Ehrlich Dep., Ex. 3 at  p. 45, ln. 1-11; Prusinski Dep., Ex. 4 at p. 31, lns. 1-11; Reale Dep., Ex. 5, p. 48, lns. 1-5).

26.     Plaintiffs Ehrlich and Prusinski visited the manufacturing plant in New Britain, Connecticut where the ice cream cakes were manufactured and acknowledged that the ice cream cakes were pre-packaged before leaving New Britain, Connecticut and therefore were not packaged at the Burris facility in Florida.  (Ehrlich Dep., Ex. 3 at p. 44, lns. 14-19 and p. 45, ln. 13 to p. 46, ln. 1; Prusinski Dep., Ex. 4 at p. 34, ln. 18 to p. 35, ln. 12).

27.     Because the ice cream cakes and frozen desserts delivered by Plaintiffs to retail outlets in Florida were perishable, these products necessarily were stored at the Burris Facility on a temporary basis with the Burris facility given instructions to release the products on a "first-in/first-out" basis.   (Deposition of Brad Smith, Rich Regional District Manager who oversees management of the Burris facility, taken on October 31, 2017 ("Smith Dep."), Ex. 8 at p. 16, lns. 4-13).

28.     Under the "first-in/first out" basis of rotation, the turnover of the perishable ice cream cakes and frozen desserts temporarily stored at Burris results in complete turnover more than once a month in terms of the dollar value of the products. (Smith Dep., Ex. 8 at p. 37, ln. 18 to p. 38, ln. 8).  Additionally, while there are occasional products that do not sell, these products are either disposed of as "out of date" or sold as "distressed products" to prisons or food banks and, importantly, are never transported by the Burris shuttles to the trucks driven by the Plaintiffs.  (Smith Dep., Ex. 8 at p. 14, lns. 3 to 20).

29.     Rich does not own the Burris facility, but it does control its products while stored at the Burris facility pursuant to a contract overseen by Brad Smith, Rich's regional distribution manager who oversees the relationship with the Burris facility.  (Smith Dep., Ex. 8 at p. 5, ln. 1 to p. 6, ln. 1).  Under the Burris contract, Rich reserves to itself the right to oversee and control the storage to make sure that inventory is correct, that orders are pulled and that the Burris

facility is doing what it has committed to do under Rich's contract with the Burris facility. (Smith Dep., Ex. 8 at p. 34, ln. 14 to p. 36, ln. 24 and p. 13, ln. 19 to p. 14, ln. 2). The products temporarily stored at the Burris facility are subject to rapid turnover and are not packaged or altered by the Burris facility but only stored there for a brief period of time before being transferred by shuttle trucks to the RSRs for distribution to retail stores in Florida. (Smith Dep., Ex. 8 at p. 11, lns. 9-20 and p. 37, ln. 18 to p. 38, ln. 8; Ehrlich Dep., Ex. 3 at p. 44, lns. 14-19 and p. 45, ln. 13 to p. 46, ln. 1; Prusinski Dep., Ex. 4 at p. 34, ln. 18 to 35, ln. 12).

30.   As described by Plaintiff Erhlich, Rich's purpose with respect to the products delivered to Florida is to ensure that not too many cakes are shipped to Burris so as to minimize scrap and waste and to maximize opportunities. (Ehrlich Dep., Ex. 3, p. 53, ln. 7-22; *Accord,* Barnes Aff., Ex 1 ¶ 6). This policy is implemented through forecasting of sales so that the amount of product manufactured and shipped is sufficient to meet customer needs, but—at the same time—avoid waste and enhance profits. (Barnes Aff., Ex. 1 at ¶ 7). The forecasts are prepared by Shirley Barnes, Demand Planner, who forecasts future sales for the long term for two years going forward and adjusts these forecasts for the short term month-to-month with review of the projections every day, to ensure accuracy as much as possible to provide "real-time" forecasts, taking into account the historical demand of customers as well as current developments including weather events, store promotions, store losses and closings and numerous other factors. (Barnes Aff., Ex. 1 at ¶ 8; Deposition of Shirley Barnes taken on September 11, 2017 ("Barnes Dep."), Ex. 9 at p. 6, lns. 4-11; p. 8, ln. 1 to p. 11, ln. 23; and p. 13, ln. 17 to  p. 15, ln. 20; p. 16, ln. 6 to p. 17, ln. 12; p. 18, ln. 10 to p. 21, ln. 9; p. 22, ln. 6 to ln. 23; p. 23, ln. 10 to p. 24, ln. 2; p. 24, ln. 12 to p. 26, ln. 19; p. 27, ln. 20 to p. 28, ln. 6). Rich's objective in conducting these forecast activities is to forecast sales so that the quantity of product

to be shipped to Burris is sufficient to meet customer needs without shipping too much product which would result in loss due to the perishable nature of ice cream cakes and frozen desserts which requires that Rich get these products into the hands of the end consumer as soon as possible.  (Barnes Aff., Ex. 1 at ¶ 9).  It is the intent of Rich to replenish the warehouse at a rate that is below the actual forecasts with the result that Rich is more at risk of cutting customers or being short to prevent warehouse spoilage because the ice cream cakes and frozen desserts are such expensive products.  (Barnes Aff., Ex. 1 at ¶ 10; Barnes Dep., Ex. 9 at p. 23, ln. 10 to p. 24, ln. 2).

31.     Plaintiff Prusinski testified that he was told by his supervisor Shawn Wolf that the number of ice cream cakes shipped to Burris from Connecticut was based on forecasts created on the basis of past sales and he had no reason not to believe Shawn Wolf.  (Prusinski Dep., Ex. 4 at p. 38, lns. 11-19).

32.     Shipments of ice cream cakes from New Britain, Connecticut to the Burris facility in Florida, for example, occur typically twice a week.  (Deposition of Kevin Wolf, Rich's Fulfillment Planner, taken on September 13, 2017 ("K. Wolf Dep."), Ex. 10 at p. 18, lns. 8 to 20).  The space rented at the Burris facility by Rich is never full and, as stated by Kevin Wolf, "in my time space has never been an issue at Burris."  (K. Wolf Dep., Ex. 10, p. 17, lns. 6-11).  At least two trucks are sent each week because the product replenishment will not fit in one truck.  (K. Wolf Dep., Ex. 10, p. 19, lns. 5-8).  The Burris facility does not know the amount of product that is coming in and is just notified that a truck is delivering product.  (K. Wolf Dep., Ex. 10 at p. 17, lns. 1-5).

33.     The Plaintiffs acknowledged their role in assisting in estimating the number of ice cream cakes and other frozen products needed for their routes by submitting on a daily basis

orders to Rich through their hand-held devices. (Ehrlich Dep., Ex. 3 at p. 23, lns. 12-23; p. 24, lns. 4-13; p. 25, ln. 9-13; and p. 26, lns. 1-11; Prusinski Dep., Ex. 4 at p. 28, lns. 18-25; p. 27, lns. 11-23; p. 28, lns. 4-7; and p. 29, lns. 1-2; and Reale Dep., Ex. 5 at p. 22, lns. 9-24; p. 23, lns. 7-13; and p. 23, ln. 24 to p. 24, ln. 3).

34.     Plaintiff Ehrlich even stated that the purpose of the forecasting activities could be described by referring to the "Goldilocks'" story.  Namely, the objective of these efforts was to ensure that the product shipped "was not too little and not too much."  (Ehrlich Dep., Ex. 3 at p. 73, ln. 23 to p. 74, ln. 7.  *Accord* Ehrlich Dep., Ex. 3 at p. 26, lns. 1-11; p. 70, ln. 1 to p. 71, ln. 1; and p. 73, lns. 7-11).

35.     All the Named Plaintiffs also confirmed that, while there might occasionally be a product that did not sell, more typically, it was their personal experience that they would be "shorted" on product they had ordered for their routes because there was insufficient supply at the Burris facility to fulfill their orders.  (Ehrlich Dep., Ex. 3 at p. 54, lns. 13-17; Prusinski Dep., Ex. 4 at p. 29, lns. 10-17; Reale Dep., Ex. 5 at p. 24, lns. 4-10.  *Accord* Barnes Aff., Ex. 1 at ¶ 11).

36.     Likewise, the perishable nature of the ice cream cakes and frozen desserts was acknowledged by the Plaintiffs in their deposition testimony, confirming that it is not possible to store product on a long term basis at the Burris facility since these products would have to be destroyed given their shelf life if Burris were overstocked with these perishable products.  (*See* Ehrlich Dep., Ex. 3 at p. 19, ln. 25 to p. 20, ln. 1; p. 53, lns. 7 to p. 54, ln. 1 and p. 55, lns. 17-25; Prusinski Dep., Ex. 4 at p. 32, ln. 23 to p. 33, ln. 12 and p. 31, lns. 4-8; Reale Dep., Ex. 5 at p. 21, lns. 1-7 and p. 53, lns. 7-10.  *Accord,* Barnes Aff., Ex. 1 at ¶ 12).

## MEMORANDUM OF LAW

### I.     STANDARD OF REVIEW

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The initial burden is on the moving party to show that there are no genuine issues of material fact to be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When a moving party discharges its burden, the non-moving party must "go beyond the pleadings," and by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a "genuine issue for trial."  *Id.* at 324.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  It has long been the rule that a mere "scintilla" of evidence supporting the opposing party's position will not suffice, and instead, there must be sufficient evidence to show that the jury could reasonably find for that party.  *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).  Whether a plaintiff falls within the scope of an FLSA exemption, while based on the underlying facts, is ultimately a question of law.  *Viart v. Bull Motors, Inc.*, 149 F. Supp. 2d 1346, 1349 (S.D. Fla. 2001).  However, the employer has the burden to establish the applicability of the exemption.  *Mena v. McArthur Dairy,* 352 Fed. Appx. 303, 305, 2009 U.S. App. LEXIS 21142 *3 (11th Cir. Sept. 22, 2009).

## II.     ARGUMENT

### A.  <u>Under Virtually Identical Circumstances the Eleventh Circuit Upheld Summary Judgment Based on the Motor Carrier Act Exemption</u>

The Eleventh Circuit upheld a dismissal of overtime pay claims brought under the FLSA in a decision involving undisputed facts virtually identical to those present here in *Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 303-306, 2009 U.S. App. LEXIS 21142 at *3-7.  As in this case, the undisputed facts in the *McArthur Dairy* case were that the plaintiff delivered perishable dairy products manufactured outside of Florida to retail outlets in Florida.  Even though these products in the *McArthur Dairy* case were temporarily stored in a Miami warehouse—as is the case here where the perishable ice cream cakes and frozen desserts are temporarily stored at the Burris facility—the Eleventh Circuit found that the products delivered by the plaintiff were part of "the practical continuity of movement across state lns." and, therefore, the Motor Carrier Act Exemption applied requiring that summary judgment be granted in favor of the employer.  *Id.*  Importantly, in the *McArthur Dairy* case, the Eleventh Circuit emphasized that—in determining the "practical continuity of movement across state lns."—a "critical factor" is the "fixed and persistent intent of the shipper at the time of shipping the product."  *Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 304, 2009 U.S. App. LEXIS 21142 at *3.  As discussed below, given the remarkable similarities of this case to the *McArthur Dairy* case,* and given the utilization by Rich of forecast activities clearly showing "a fixed and persistent intent" by Rich to ship only as much product to the Burris facility as needed to meet customer demand and to avoid spoilage of these perishable ice cream cakes and frozen desserts, the same principles apply here as were applied to McArthur Dairy's perishable dairy products that also were temporarily stored in a Miami warehouse before being distributed by plaintiff Mena in Florida.  Hence, summary judgment must be granted.

### B.  Congress Exempted the Motor Carrier Act From FLSA

The Motor Carrier Act ("MCA") was enacted to promote efficiency, economy, and safety in the rapidly developing motor transportation industry.  *U.S. v. American Trucking Assn's, Inc.*, 310 U.S. 534, 538-39 (1940).  When Congress enacted the Fair Labor Standards Act ("FLSA") three years after enacting the MCA, it preserved intact the safety program which it and the Interstate Commerce Commission (the "ICC") had been developing for motor carriers since 1936 by avoiding any overlap in jurisdiction between the agencies governing the FLSA and the MCA. *Levinson v. Spector Motor Service*, 330 U.S. 649, 661 (1947).  *See also, Shew v. Southland Corp.*, 370 F.2d 376, 380 (5th Cir. 1966) (recognizing that "there is no concurrent jurisdiction between the Fair Labor Standards Act and the Motor Carrier Act").  Indeed, Congress specifically stated that the overtime requirements of the FLSA would not apply to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of Section 31502 of Title 49.  See 29 U.S.C. § 213(b)(1).  This "exception" to the overtime requirements of the FLSA commonly is known as the "Motor Carrier Act Exemption."  It was this very Motor Carrier Act Exemption that was applied in the *McArthur Dairy* case to find that summary judgment was properly granted by the District Court as to the plaintiff's claim for overtime compensation.  *Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 305-306, 2009 U.S. App. LEXIS 21142  at *3-7.

### C.  Rich is a DOT Private Motor Carrier and the Motor Carrier Act Exemption Applies to the Plaintiffs' Activities

Section 31502 of Title 49 of the United States Code provides that "[t]he Secretary of Transportation may prescribe requirements for (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private

carrier, when needed to promote safety of operation." As the Eleventh Circuit observed in the

*McArthur Dairy case,* the Motor Carrier Act Exemption is triggered if: (1) the employee is

employed by a carrier whose transportation of passengers or property by motor vehicle is subject

to the Secretary's jurisdiction under the Motor Carrier Act; and (2) the employee is engaged in

activities of a character directly affecting the safety of operation of motor vehicles in interstate or

foreign commerce within the meaning of the Motor Carrier Act. *Mena v. McArthur Dairy,*

*supra,* 352 Fed. Appx. at 305, 2009 U.S. App. LEXIS 21142 at *3. *Accord,* 29 C.F.R. § 782.2;

*McIntyre v. FLX of Miami, Inc.*, No. 08-20030-CIV, 2008 WL 4541017, at *4 (S.D. Fla. Oct. 8,

2008); *Walters v. American Coach Lns. of Miami, Inc.*, 569 F. Supp. 2d 1270, 1281-82 (S.D. Fla.

2008); *Baez v. Wells Fargo Armored Service Corp.,* 938 F.2d 180, 181 (11th Cir. 1991);

*Alvarado v. I.G.W.T. Delivery Systems, Inc.,* 410 F. Supp. 2d 1272 (S.D. 2006).

### 1) *Rich Clearly is a Motor Private Carrier Regulated by the DOT*

Thus, we turn to the first prong of the test set forth in the *McArthur Dairy* case—namely,

whether the Plaintiffs are employed by a carrier subject to DOT regulation. Given the

uncontroverted facts, it is indisputable that Rich is a "motor private carrier" and is subject to the

Secretary of Transportation's jurisdiction. A "motor private carrier" is a person,[3] other than a

motor carrier,[4] transporting property by commercial motor vehicle[5] (as defined in Section 31132)

when: (A) the transportation[6] is as provided in Section 13501 of the MCA;[7] (B) the person is the

---

[3] The word "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. 1 U.S.C. § 1.

[4] The term "motor carrier" means "a person providing commercial motor vehicle (as defined in section 31132) transportation for compensation." See 49 U.S.C. § 13102 (14).

[5] The term "commercial motor vehicle" means "a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle – (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater." 49 U.S.C. § 31132(1).

[6] The term "transportation" includes a "motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of

owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial purpose. *See* 49 U.S.C. § 13102(15).

There is no dispute that Rich is a person that transports property by "commercial motor vehicle." SOF ¶¶ 3-5 and ¶¶ 19-24. Rich transports products to the Burris facility and from Burris to its customers in Florida on refrigerated trucks having a gross weight of over 10,000 pounds—the threshold established by Congress to qualify as "commercial motor vehicles." *See* 49 U.S.C. 31132(1); SOF at ¶¶ 4, 5, 8, 11 and 24. In addition, there is no dispute that Rich is either the owner or the bailee of the products that it transports to its customers, and that it sells these products to further a commercial purpose, i.e., to increase its sales and revenues. *See* 49 U.S.C. § 13102(15)(B) and (C); SOF at ¶¶ 4-6, 9, 12, 25, 29-30 and 34.

Further, the record establishes that Rich's transportation services are the type of "interstate transportation" contemplated by Section 13501; *see* 49 U.S.C. § 13102(15)(A). Thus, all the ice cream cakes and frozen desserts delivered by the Plaintiffs are manufactured in states other than Florida and **none** are manufactured or produced in Florida. SOF at ¶¶ 25 and 26. These out-of-state products are shipped by Rich to the Burris facility where they are stored on a temporary basis and then transferred by Burris shuttle trucks and loaded onto Rich's refrigerated trucks driven by the RSRs, and then delivered to Rich's customers, who include grocery stores and other retail outlets. SOF at ¶¶ 4-5 and 25-29.

---

ownership or an agreement concerning use; and...services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property." 49 U.S.C. § 13102(23).

[7] Section 13501 provides that the Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier – (1) between a place in – (A) a State and a place in another State; (B) a State and another place in the same State through another State; . . . (E) the United States and a place in a foreign country to the extent the transportation is in the United States." See also 49 C.F.R. § 390.5.

Rich also requires that its RSRs comply with the Federal Motor Carrier Safety Regulations ("MCSR").  SOF at ¶¶ 7, 10 and 13.  Rich provides DOT instruction to its drivers on a regular basis.  SOF ¶¶ 7, 10, 13 and 22.  Likewise, Rich maintains the records required by DOT to ensure that its drivers are in compliance with the requirements of DOT.  SOF ¶¶ 19 and 22.  Additionally, Rich's RSRs are required to conduct daily pre-trip inspections of their vehicles, have been subjected to DOT inspection of vehicles and also are required to submit to random drug and alcohol testing pursuant to the Motor Carrier Safety Regulations.  SOF ¶¶ 7, 10, 13 and 21-24.  Finally, the RSRs all hold commercial drivers' licenses.  *Id.*

All of these undisputed facts establish that Rich is a private motor carrier that is regulated by the DOT.  *Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 305, 2009 U.S. App. LEXIS 21142  at *3 (DOT has authority to exercise power where, as here, the employer is registered with the DOT, maintains the records required by DOT and the employer's trucks and drivers have been inspected and subjected to regulation by DOT).  *Accord, Baez v. Wells Fargo*, 938 F.2d 180, 182 (11th Cir. 1991); *Walters v. American Coach Lns. of Miami, Inc.*, 569 F. Supp. 2d 1270, 1274 (S.D. Fla. 2008) (Ungaro, J.); *Morrison v. Quality Transports Services, Inc.*, 474 F. Supp. 2d 1303, 1309 (S.D. Fla. 2007).

Thus, Rich meets the first prong of the test set forth in the *McArthur Dairy* case and the Motor Carrier Act Exemption must be applied if the Plaintiffs' activities "affected the safety of operation of motor vehicles in interstate or foreign commerce."  29 C.F.R. § 782.2; *Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 305-306, 2009 U.S. App. LEXIS 21142  at *3-7.  *See also, Walters v. American Coach Lns. of Miami, Inc., supra,* 569 F. Supp. 2d at 1281-82.

2)  *The Plaintiffs' Activities Qualify as Affecting Safety in the Operation of Motor Vehicles in Interstate Commerce*

Having established that Rich is a DOT regulated private motor carrier, we now turn to the second prong of the test as stated by the Eleventh Circuit in the *McArthur Dairy* case—namely, have the plaintiffs "engaged in activities of a character directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 305, 2009 U.S. App. LEXIS 21142 at *3.

The record establishes that Plaintiffs' activities directly affected the operation and safety of motor vehicles.  It is undisputed that the Plaintiffs are and were responsible for driving trucks weighing over 10,000 pounds and that they operated these trucks on public highways.  SOF ¶¶ 5-14, 20, 23 and 24.  Indeed, the Plaintiffs' Complaint states that Plaintiffs "were engaged in interstate commerce during their employment with Defendant."  SOF at ¶ 16.  Of course, these activities by the Plaintiffs in delivering products by driving commercial trucks weighing over 10,000 pounds are the kinds of activities that clearly affect highway safety as contemplated by the MCA.  *Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 305, 2009 U.S. App. LEXIS 21142 at *3.  *Accord, Levinson v. Spector Motor Serv.*, 330 U.S. 649 (1947); *Morris v. McComb*, 332 U.S. 422 (1947); *Alvarado*, *supra,* 410 F. Supp. 2d at 1277; *Walters v. American Coach Lns. of Miami, Inc.*, *supra,* 569 F. Supp. 2d at 1282.  As found in *Alvarado,* there is no question that—as delivery truck drivers—plaintiffs' activities directly affected the safety of motor vehicle operation.  *Alvarado*, *supra,* 410 F. Supp. 2d at 1277.

While Plaintiffs can be expected to argue that their "intrastate" deliveries do not constitute "interstate" transportation, this argument clearly is without merit as a matter of law and here, as in the *McArthur Dairy* case, Plaintiffs' intrastate deliveries to Rich's customers

qualify as interstate transportation within the meaning of the MCA. *Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 305-306, 2009 U.S. App. LEXIS 21142 at *3-7. *Accord, Williams v. R.W. Cannon, Inc.*, No. 08-60168-CIV-UNGARO, 2008 WL 4097613 at *9 (S.D. Fla. Sept. 4, 2008) (citing 29 C.F.R. § 782.7). *See also, Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943) (United States Supreme Court holding that a driver who is engaged in the single-state transportation of goods in interstate commerce does not have to cross state lns. to be engaged in interstate or foreign commerce pursuant to the MCA).

As recognized in the *McArthur Dairy* case, from their earliest consideration of the MCA, the Supreme Court and other courts have recognized that transportation within a single state is "interstate" in nature if it forms part of a "practical continuity of movement" across state lns. from the point of origin to the point of destination. *Jacksonville Paper, supra,* 317 U.S. at 568; *see also, Atlantic Coast Ln. R. Co.*, 275 U.S. 257, 267-69 (1927); *Shew v. Southland Corp.*, 370 F.2d 376 (5th Cir. 1966); *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993). It is now established that "[i]f there is a practical continuity of movement from the manufacturers or suppliers without the state, through [a defendant's] warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse." *See, e.g., Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 305-306, 2009 U.S. App. LEXIS 21142 at *3-7; *Jacksonville Paper*, *supra,* 317 U.S. at 569. *See also Baez*, *supra,* 938 F.2d at 182; *Alvarado v. I.G.W.T. Delivery Systems, Inc.*, *supra,* 410 F. Supp. 2d at 1277 ("it is irrelevant that the plaintiffs themselves only traveled within the South Florida area picking up and delivering packages, as this is enough to satisfy the interstate commerce requirement").

Of course, the Eleventh Circuit applied the foregoing principles when it decided the *McArthur Dairy* case and expressly stated as follows in response to arguments as to the purported "intrastate nature" of the plaintiff's activities in the *McArthur Dairy* case:

> "It is undisputed that [the plaintiff']'s job activities took place wholly within the State of Florida. Nonetheless, for the purposes of the Motor Carrier Act Exemption, "purely intrastate transportation can constitute interstate commerce if it is part of a 'continuous stream of interstate travel.' For this to be the case, there must be a 'practical continuity of movement between the intrastate segment and the overall interstate flow.' **A critical factor in determining the shipment's essential character is the shipper's 'fixed and persistent intent' at the time of the shipment.** In the instant case, we are persuaded that [plaintiff] transported property in interstate commerce. Uncontroverted evidence establishes that much of **the property that [plaintiff] transported previously had been manufactured in other states** by McArthur's parent company **and delivered to McArthur's Miami warehouse.** Because McArthur delivered dairy and other refrigerated products to customers, **the property transported was perishable and usually of a relatively short shelf life.** The property **was pre-packaged and not modified once it reached McArthur's warehouse.** From there, **the products were delivered to McArthur's customers based on standing orders and projected needs as calculated by customers' past purchases.** Under these circumstances, McArthur's warehouse was nothing more than a temporary storage hub used to facilitate the orderly distribution of products through interstate commerce."

*Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 304-305, 2009 U.S. App. LEXIS 21142 at *3-7 (citations omitted) (emphasis added). *See also Shew v. Southland Corp.*, 370 F.2d 376 (5th Cir. 1966) (where the Fifth Circuit court held that the exemption applied to a driver who transported dairy products from a plant in Texas to branch stores in Texas of products originating from outside the state); *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 942 (5th Cir. 1969) (holding that truck drivers who transported petroleum from Atlanta plant to other locations in Georgia, without leaving the state, were part of interstate commerce because the products transported had been shipped to Atlanta from Texas and Mississippi); *Swift Textiles, Inc. v. Watkins Motor Lns., Inc.,* 799 F.2d 697 (11th Cir. 1986) (shipment sent from Switzerland to South Carolina and then trucked to Savannah, Georgia, warehoused, and transported by truck to LaGrange, Georgia, was

interstate commerce); *Walters*, *supra,* 569 F. Supp. 2d at 1287; *McIntyre*, *supra,* 2008 WL 4541017 at *3 ("[t]ransportation within a single state may remain 'interstate' in character when it forms a part of a 'practical continuity of movement' across state lns. from the point of origin to the point of destination").

The criteria on which the Eleventh Circuit based its determination in the *McArthur Dairy* case—highlighted in bold in the quotation above—that there was a "continuing and persistent intent at the time of shipment" so as to establish interstate commerce by reason of a "practical continuity of movement between the intrastate segment and the overall interstate flow" are the same criteria present here. Thus, summary judgment should be granted.

For example, it is indisputable that **the property that Rich transported was previously manufactured in other states** by Rich. SOF at ¶ 2. Indeed, unlike the *McArthur Dairy* case where "much" of the product was manufactured elsewhere, <u>none</u> of Rich's ice cream cakes or frozen desserts are manufactured or originate in Florida. SOF at ¶ 25. While McArthur apparently owned the warehouse, it is indisputable that **Rich controls its products while at the Burris facility in that Rich has a contract with the Burris facility directing Burris as to the handling, release and transfer of products temporarily stored at the Burris facility from Burris to the Plaintiffs.** SOF at ¶¶ 29 and 28. Thus, there is no distinction between this case and the *McArthur Dairy* case as to continuing control over these products by Rich. Specifically, under the Burris contract, Rich reserves to itself the right to oversee and control the storage to make sure that inventory is correct, that orders are pulled and that the Burris facility is doing what it has committed to do under Rich's contract with the Burris facility. SOF at ¶ 29.

Likewise, in the *McArthur Dairy* case, the products stored at Burris are **pre-packaged and not modified** once they reach the Burris facility. SOF at ¶¶ 26 and 29. Similarly, as in the

*McArthur Dairy* case, the products transported to Burris are **perishable and usually of a relatively short shelf life.**  SOF at ¶¶ 8, 11, 14, 28 and 29.  Moreover, any "out of date" or "distressed products" are either disposed of or sold as distressed product to prisons or food banks and, importantly, are never transported by the Burris shuttles from the Burris facility to the Plaintiffs' trucks.  SOF at ¶ 28.

Finally, just as in the *McArthur Dairy* case, the quantity of products placed in interstate commerce are measured so as to meet to the needs of the customers to whom Plaintiffs deliver the products.   Indeed, much like the *McArthur Dairy* case, the quantities are **calculated by customers' past purchases.**  Specifically, Rich's forecasts are prepared by Shirley Barnes, Demand Planner, who forecasts future sales for the long term for two years going forward and adjusts these forecasts for the short term month-to-month with review of the projections every day, to ensure accuracy as much as possible to provide "real-time" forecasts, taking into account the historical demand of customers as well as current developments including weather events, store promotions, store losses and closings and numerous other factors.   SOF at ¶ 30.   The objective of these forecast activities is to forecast sales so that the quantity of product to be shipped to Burris is sufficient to meet customer needs without shipping too much product, thereby resulting in loss due to the perishable nature of ice cream cakes and frozen desserts so that these products get into the hands of the end consumer as soon as possible.  *Id.*

There are numerous additional undisputed facts demonstrating the "fixed and persistent intent" so as to establish the "practical continuity of movement between the intrastate segment and the overall interstate flow."  Shipments of ice cream cakes from New Britain, Connecticut to the Burris facility in Florida, for example, occur typically twice a week.  SOF at ¶ 32.  The space rented at Burris by Rich is never full and, as stated by Kevin Wolf, "in my time space has never

been an issue at Burris." *Id.*  At least two trucks are sent each week because the product replenishment will not fit in one truck.  *Id.*  Indeed, Rich's intent is to replenish Burris at a rate that is below the actual forecasts with the result that Rich is more at risk of "cutting" customers or "being short" to prevent warehouse spoilage because the ice cream cakes and frozen desserts are such expensive products.  SOF at ¶ 30.

Again, as was the case in the *McArthur Dairy* case, the trucks are not merely randomly stocked with a variety of product.  Instead the Plaintiffs place orders based on specific customer needs.  *See Mena v. McArthur Dairy, supra,* 352 Fed. Appx. at 5, Note 3, 2009 U.S. App. LEXIS 21142.  Namely, Plaintiffs themselves have acknowledged their role in assisting in estimating the number of ice cream cakes and other frozen products needed for their routes by submitting, on a daily basis, orders to Rich through their hand-held devices.  SOF at ¶ 33. Plaintiff Ehrlich even stated that the purpose of the forecasting activities could be described by referring to the "Goldilocks'" story.  As Plaintiff Ehrlich observed generally with respect to Rich's program of forecasting sales, the objective of these efforts was to ensure that the product shipped "was not too little and not too much."  SOF at ¶ 34.  While there was testimony by the Plaintiffs that there might occasionally be a product that did not sell, all the Plaintiffs conceded that, more typically, it was their personal experience that they would be "shorted" on product they had ordered for their routes because there was insufficient supply at the Burris facility to fulfill their orders.  SOF at ¶ 35.

Thus, as the record evidence demonstrates, there is no doubt that Rich has a "fixed and persistent intent" to maintain a constant flow of product through the Burris facility rather than allowing product to languish at that facility.   These circumstances clearly and indisputably demonstrate the products distributed by Plaintiffs are part of the flow of interstate commerce due

to the "practical continuity of movement between the intrastate segment and the overall interstate flow" with respect to the ice cream cakes and frozen desserts delivered by Plaintiffs to Rich's customers.   In fact, the perishable nature of the ice cream cakes and frozen desserts was acknowledged by all the Named Plaintiffs in their deposition testimony, thereby confirming that it is not possible to store product on a long term basis at the Burris facility.   SOF at ¶ 8, 11, 14 and 36.

### III.     CONCLUSION

As the foregoing undisputed facts establish, Defendant Rich is a private motor carrier governed by DOT regulations and Plaintiffs' activities directly have affected the safety of motor vehicles in interstate.   Accordingly, the Motor Carrier Act Exemption is applicable here and there is no basis for Plaintiffs' claims of entitlement to overtime pay.   Therefore, it is respectfully submitted that Defendant is entitled to summary final judgment as a matter of law.

WHEREFORE, Defendant, Rich Products Corporation, respectfully requests that this Honorable Court grant its Motion for Summary Final Judgment in its entirety, and that it grant all other appropriate relief, including its costs associated with the defense of this action.

DATED December 7, 2017

Respectfully submitted,

**SCHRÖDER, JOSEPH & ASSOCS., LLP**

By: s/ *Linda H. Joseph*_____
Linda H. Joseph, Esq.
Email: ljoseph@sjalegal.com
*Admitted pro hac*
392 Pearl Street, Suite 301
Buffalo, NY 14202
Tel: (716) 881-4902
Fax: (716) 881-4909

**GUNSTER, YOAKLEY & STEWART, P.A.**

By: s/ *Brian M. McPherson*
G. Joseph Curley, Esq.
Email: jcurley@gunster.com
Florida Bar. No. 571873
Brian M. McPherson, Esq.
Email: bmcpherson@gunster.com
Florida Bar No. 0735541
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL 33401
Tel: 561-650-0577
Fax: 561-655-5677
*Counsel for Defendant Rich Products Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2017, I electronically filed the foregoing Motion with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified below via transmission of Notices of Electronic Filing generate by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ *Brian M. McPherson*
BRIAN M. McPHERSON

## SERVICE LIST
*Scott Ehrlich, Salvatore Reale and Gary Prusinski*
*Case No. 8:16-cv-03532-SCB-TGW*

Jay Lechner, Esq.
lechnerj@theFLlawfirm.com
Whittel & Melton, LLC
One Progress Plaza
200 Central Avenue, #400
St. Petersburg, FL  33701
Telephone:     727-822-1111
Facsimile:     727-898-2001
*Attorneys for Plaintiffs*

WPB_ACTIVE 8245585.1