UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTT EHRLICH, SALVATORE REALE,
and GARY PRUSINSKI, on behalf of
themselves and all other similarly situated,

          Plaintiffs,

vs.                                Case No.: 8:16-cv-3532-T-24TGW

RICH PRODUCTS CORPORATION,

          Defendant.
_____/

**O R D E R**

**THIS CAUSE** comes before the Court on Defendant Rich Products Corporation's Motion for Summary Judgment, Statement of Undisputed Material Facts and Memorandum of Law with supporting exhibits (Doc. 45), Plaintiffs Scott Ehrlich, Salvatore Reale and Gary Prusinski's Memorandum in Opposition with exhibits (Doc. 48), and Defendant Rich Products Corporation's reply brief (Doc. 51).

**I. INTRODUCTION**

The Complaint in this action seeks compensation on behalf of the Named Plaintiffs and the Opt-in Plaintiffs[1], current and former employees of Defendant Rich Products Corporation ("Rich") for unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). Rich seeks the entry of final summary judgment on grounds that Plaintiffs are

---

[1] Phase I notices under the FLSA were sent by Plaintiffs' counsel to 30 persons. Of those 30 persons, there were eight persons who chose to opt into the FLSA collective action. The Opt-In Plaintiffs are: James Scheidemantel, Anthony Rosa, August Eck, Gregory Potter, Manuel Lopez, Mark Wall, Michael Sanchez and Harry Fonseca.

exempt from the overtime pay provisions of the FLSA by virtue of the Motor Carrier Act Exemption found in 29 U.S.C. § 213 9b)(1). Having carefully considered the parties' submissions, the Court finds that Defendant's Motion is due to be granted and that Defendant is entitled to judgment as a matter of law. Rich meets the two requirements needed to trigger the Motion Carrier Exemption: (1) Plaintiffs were employed by a carrier whose transportation is subject to the Secretary of Transportation's jurisdiction under the Motor Carrier Act; and (2) Plaintiffs engaged in activities directly affecting the safety of operation of motor vehicles while moving property in interstate commerce.

## II.  BACKGROUND AND FACTS

### A.  Defendant's Business Activities:

Rich manufactures and distributes food products worldwide to food service, in-store bakery and retail marketplaces. (Affidavit of Shirley Barnes ("Barnes Aff."), Ex. 1, ¶ 3).[2] This lawsuit concerns Rich's distribution in Florida of Carvel® ice cream cakes that it manufactures in New Britain, Connecticut, as well as other frozen desserts manufactured at locations outside of Florida ("the subject products"). (*Id.* at ¶ 4). Because the subject products are perishable, they are shipped from where they are manufactured via refrigerated tractor-trailer trucks weighing over 10,000 pounds. (Affidavit of Shawn Wolf ("Wolf Aff."), Ex. 2, ¶ 5. *See also,* Deposition of Plaintiff Scott Ehrlich ("Ehrlich Dep."), Ex. 3, p. 19, ln. 25 to p. 20, ln. 1 and p. 44, lns. 14–19; Deposition of Plaintiff Gary Prusinski ("Prusinski Dep."), Ex. 4, p. 31, lns. 9–19 and p. 32, lns. 1–11; and Deposition of Plaintiff Salvatore Reale ("Reale Dep."), Ex. 5, p. 48, lns. 1–25).

Rich provides the trucking companies that it hires with instructions regarding the time

---

[2]  Unless otherwise stated, the exhibits cited throughout this Order are attached to Defendant's Motion for Summary Judgment (Doc. 45).

and place for pick up and delivery of the subject products. (Wolf Aff., Ex. 2, ¶ 6). Because of the perishable nature of these products, Rich also provides lading instructions to deliver them to a storage facility in Florida ("the Burris Facility") where they are temporarily held until they are transported by shuttle trucks to the actual delivery trucks for distribution to retail stores in Florida. (*Id.* at ¶¶ 7–8). Rich does not own the Burris Facility, but it does control its subject products while they are stored there pursuant to a contract overseen by Brad Smith, Rich's regional distribution manager. (Deposition of Brad Smith ("Smith Dep."), Ex. 8, p. 5, ln. 1 to p. 6, ln. 1). Under said contract, Rich reserves to itself the right to oversee and control the storage to make sure that inventory is correct and that orders are properly filled. (*Id.* at p. 34, ln. 14 to p. 36, ln. 24 and p. 13, ln. 19 to p. 14, ln. 2). Shipments of the subject products to the Burris Facility typically occur twice a week. (Deposition of Kevin Wolf, Rich's Fulfillment Planner, ("K. Wolf Dep."), Ex. 10, p. 18, lns. 8 to 20). The space rented at the Burris Facility by Rich is never full. (*Id.* at p. 17, lns. 6–11). At least two trucks are sent each week because the product replenishment will not fit in one truck. (*Id.* at p. 19, lns. 5–8). The Burris Facility does not know the amount of product that is coming in and is only notified that a truck is delivering products. (*Id.* at p. 17, lns. 1–5).

Once the subject products are at the Burris Facility, Rich provides instructions to release them on a "first-in/first-out" basis. (Smith Dep., Ex. 8, p. 16, lns. 4–13). This system of rotation results in a complete turnover of the subject products at the Burris Facility more than once a month in terms of the dollar value of the products. (*Id.* at p. 37, ln. 18 to p. 38, ln. 8). While there are occasional products that do not sell, these products are either disposed of as "out of date" or sold as "distressed products" to prisons or food banks and, importantly, are never transported by the shuttles to the actual delivery trucks. (*Id.* at p. 14, lns. 3 to 20). The subject

products are not packaged or altered before being transferred by shuttle trucks to the actual delivery trucks for distribution to retail stores in Florida. (*Id.* at p. 11, lns. 9–20 and p. 37, ln. 18 to p. 38, ln. 8; Ehrlich Dep., Ex. 3, p. 44, lns. 14–19 and p. 45, ln. 13 to p. 46, ln. 1; Prusinski Dep., Ex. 4, p. 34, ln. 18 to p. 35, ln. 12).

Rich uses forecasting of sales to ensure that the amount of the subject products that is manufactured and shipped is sufficient to meet customer needs, while—at the same time—avoids waste and enhances profits. (Barnes Aff., Ex. 1, ¶ 7). The forecasts are prepared by Shirley Barnes, Demand Planner, who forecasts future sales for the long term (for two years going forward) and then adjusts them for the short term (month-to-month) with review of the projections every day, so as to ensure as much accuracy as possible and provide "realtime" forecasts. (Barnes Aff., Ex. 1, ¶ 8; Deposition of Shirley Barnes ("Barnes Dep."), Ex. 9, p. 6, lns. 4–11; p. 8, ln. 1 to p. 11, ln. 23; and p. 13, ln. 17 to p. 15, ln. 20; p. 16, ln. 6 to p. 17, ln. 12; p. 18, ln. 10 to p. 21, ln. 9; p. 22, ln. 6 to ln. 23; p. 23, ln. 10 to p. 24, ln. 2; p. 24, ln. 12 to p. 26, ln. 19; p. 27, ln. 20 to p. 28, ln. 6). She takes into account the historical demand of customers as well as current developments including weather events, store promotions, store losses and closings and numerous other factors. (*Id.*). Rich's intent is to replenish the warehouse at a rate that is below the actual forecasts with the result that Rich is more at risk of being short in order to prevent warehouse spoilage because the subject products are expensive. (Barnes Aff., Ex. 1, ¶ 10; Barnes Dep., Ex. 9, p. 23, ln. 10 to p. 24, ln. 2).

**B. Plaintiffs' Employment with Defendant:**

Plaintiff Scott Ehrlich ("Ehrlich") is currently employed by Rich as a Route Sales Representative ("RSR"), whose duties include the ordering, sales, and delivery of the subject products via the aforementioned refrigerated delivery trucks to grocery stores and other retail

outlets in Florida. (Ehrlich Dep., Ex. 3, (Ehrlich Interrogatory Answers); Wolf Aff., Ex. 2, ¶ 9 and Attachment A). Plaintiffs Salvatore Reale ("Reale") and Gary Prusinski ("Prusinski") were formerly employed by Rich as RSRs and had the same job duties. (Reale Dep., Ex. 5, (Reale Interrogatory Answers); Prusinski Dep., Ex. 4 (Prusinski Interrogatory Answers); Wolf Aff., Ex. 2, ¶ 9 and Attachment A).

Plaintiffs did not deliver any products that were manufactured in or originated in Florida. (Wolf Aff., Ex. 2, ¶ 16. *See also,* Ehrlich Dep., Ex. 3, p. 45, ln. 1–11; Prusinski Dep., Ex. 4, p. 31, lns. 1–11; Reale Dep., Ex. 5, p. 48, lns. 1–5). Plaintiffs Ehrlich and Prusinski even visited the manufacturing plant in New Britain, Connecticut where the subject products were manufactured and they acknowledged that these products were pre-packaged before leaving the plant. (Ehrlich Dep., Ex. 3, p. 44, lns. 14–19 and p. 45, ln. 13 to p. 46, ln. 1; Prusinski Dep., Ex. 4, p. 34, ln. 18 to p. 35, ln. 12).

Plaintiffs also acknowledge their role in assisting in estimating the number of the subject products needed for their routes by submitting on a daily basis orders to Rich through their hand-held devices. (Ehrlich Dep., Ex. 3, p. 23, lns. 12–23; p. 24, lns. 4–13; p. 25, ln. 9–13; and p. 26, lns. 1–11; Prusinski Dep., Ex. 4, p. 28, lns. 18–25; p. 27, lns. 11–23; p. 28, lns. 4–7; and p. 29, lns. 1–2; and Reale Dep., Ex. 5, p. 22, lns. 9–24; p. 23, lns. 7–13; and p. 23, ln. 24 to p. 24, ln. 3). Ehrlich testified that the purpose of Rich's forecasting activities could be described by referring to the "Goldilocks" story or, more specifically, that the objective of these efforts was to ensure that the product shipped "was not too little and not too much." (Ehrlich Dep., Ex. 3, p. 73, ln. 23 to p. 74, ln. 7. *Accord* Ehrlich Dep., Ex. 3, p. 26, lns. 1–11; p. 70, ln. 1 to p. 71, ln. 1; and p. 73, lns. 7–11). Prusinski testified that he was told by his supervisor, Shawn Wolf, that the number of the subject products shipped to Burris from Connecticut was based on forecasts created on the

basis of past sales and that he had no reason not to believe Shawn Wolf.  (Prusinski Dep., Ex. 4 at p. 38, lns. 11–19).

Plaintiffs also confirmed that while there might occasionally be a product that did not sell, more typically, it was their personal experience that they would be "shorted" on product they had ordered for their routes because there was insufficient supply at the Burris facility to fulfill their orders. (Ehrlich Dep., Ex. 3, p. 54, lns. 13–17; Prusinski Dep., Ex. 4, p. 29, lns. 10–17; Reale Dep., Ex. 5, p. 24, lns. 4–10.  *Accord* Barnes Aff., Ex. 1, ¶ 11). Likewise, Plaintiffs acknowledge the perishable nature of the subject products, confirming that it is not possible to store the products on a long term basis at the Burris Facility because they would have to be destroyed, given their shelf life, if Burris was overstocked with them.  (*See* Ehrlich Dep., Ex. 3, p. 19, ln. 25 to p. 20, ln. 1; p. 53, lns. 7 to p. 54, ln. 1 and p. 55, lns. 17–5; Prusinski Dep., Ex. 4, p. 32, ln. 23 to p. 33, ln. 12 and p. 31, lns. 4–8; Reale Dep., Ex. 5, p. 21, lns. 1–7 and p. 53, lns. 7–10.  *Accord,* Barnes Aff., Ex. 1, ¶ 12).

Plaintiffs and all persons whom they purport to represent were paid weekly salaries. (Wolf Aff., Ex. 2, ¶ 11 and Attachment B (the Named Plaintiffs' Earning Statements for the three years preceding the filing of the Complaint in this action)).  The Complaint seeks overtime wages under the FLSA, 29 U.S.C.§ 207, for the years prior to 2016, on grounds that Plaintiffs and the additional similarly situated persons whom Plaintiffs purport to represent worked more than 40 hours per week and were "misclassified" as exempt from the FLSA overtime requirements.  (*Id.* at ¶ 9)*.*  Plaintiffs assert that they were misclassified because in December 2016, Rich's management gave a PowerPoint presentation to all of its RSRs, advising them that due to the Department of Labor's new rules relating to minimum salary requirements under the FLSA, Rich was going to reclassify its RSRs and begin paying them overtime.  (Doc. 48, Ex. 1,

p. 36).

### C. DOT Regulations:

Rich is required to register, and is registered, as a private motor carrier that is governed by and complies with the Federal Motor Carrier Safety Regulations, which were administered by the United States Department of Transportation ("DOT"), and are now administered by the Federal Motor Carrier Safety Administration (hereinafter referred to as "DOT Regulations"). (Wolf Aff., Ex. 2, ¶ 4, p. 12, and Attachment C). *Accord* Ehrlich Dep., Ex. 3, p. 36, lns. 20–25; Prusinski Dep., Ex. 4, p. 19, ln. 23 to p. 20, ln. 2 and p. 20, lns. 7–11; and Reale Dep., Ex. 5, p. 30, lns. 14–25)

As a registered private motor carrier, Rich's trucks and their corresponding records are regularly inspected by the DOT. (Wolf Aff., Ex. 2 at ¶ 12). Plaintiffs testified they conducted "walk around" inspections of their trucks before commencing work each morning and after completing work at the end of each day. (Ehrlich Dep., Ex. 3, p. 33, lns. 1–8; Prusinski Dep., Ex. 4, p. 15, ln. 17 to p. 17, ln. 5; and Reale Dep., Ex. 5, p. 36, lns. 1–16). Ehrlich also testified that he was aware of random inspections by the DOT of the trucks that delivered the subject products to grocery stores and other retail outlets. (Ehrlich Dep., Ex. 3 at p. 37, lns. 4–15). Additionally, Rich requires that its RSRs comply with all DOT rules and regulations, including possessing a commercial driver's license in order to drive the trucks that deliver the subject products to retail outlets in Florida. (Wolf Aff., Ex. 2, ¶ 13; *Accord* Ehrlich Dep., Ex. 3, p. 37, lns. 22–23; p. 43, lns. 8 to 22; and p. 34, lns. 9–25; Prusinski Dep., Ex. 4, p. 20, ln. 14 to p. 21, ln. 2; p. 17, ln. 24 to p. 18, ln.16; p. 19, lns. 5–8; p. 19, ln. 23 to p. 20, ln. 2; and p. 20, lns. 7–11; and Reale Dep., Ex. 5, p. 33, lns. 2–21; p. 35, ln. 1-3; p. 35, lns. 12–25; p. 36, lns. 1–17; p. 36, lns. 14–17; p. 37, lns. 2–15; and p. 38, ln. 1 to p. 39, ln. 7).

Rich provides DOT instruction to its drivers on a regular basis, and it schedules and monitors the service hours of its drivers so that they are in compliance with the service regulations governing drivers of vehicles in interstate commerce operations. (Wolf Aff., Ex. 2, ¶ 14). Rich maintains all required DOT records evidencing such compliance and also maintains a "driver qualification" file for each driver as required by the Motor Carrier Safety Regulations. (*Id.*). Rich's RSRs are also required to submit to pre-hire physical examinations, as well as pre-hire and random drug and alcohol testing as required by DOT regulations. (*Id.*) Plaintiffs testified to being provided the required documents concerning drug and alcohol testing and DOT compliance and they acknowledge that they were required by Rich to comply, and did comply, with all DOT Regulations as part of their job duties. (*See, e.g.,* Ehrlich Dep., Ex. 3, p. 33, ln. 1 to p. 43, ln. 22; Prusinski Dep., Ex. 4, p. 61, lns. 2–11; and p. 61, ln. 21 to p. 62, ln. 18; Reale Dep., Ex. 5, p. 37, lns. 2–15; p. 38, lns. 2–15; and p. 38, ln. 24 to p. 39, ln. 7; and Ex. 7, Deposition Exhibits documenting compliance with DOT Regulations applicable to truck drivers engaging in interstate commerce).

### III.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See DA Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254, 1265 (11th Cir. 2007). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. *See Denney v. City of Albany*, 247 F.3d

1172, 1181 (11th Cir. 2001)(citation omitted).  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  *See Porter v. Ray*, 461 F.3d 1315, 1321 (11th Cir. 2006) (citation omitted).

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  *See Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988).  Thus, if a reasonable fact-finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court has carefully reviewed the record evidence and determined that there are no genuine issues of material fact that should be decided at trial.

### IV.  FLSA OVERTIME CLAIMS AND THE MOTOR CARRIER EXEMPTION

Under the FLSA, an employer must compensate employees for hours worked in excess of forty per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  Rich argues that Plaintiffs are exempt under the Motor Carrier Exemption, 29 U.S.C. § 213(b)(1), and, therefore, they are not entitled to overtime compensation. An employer has the burden of proving the applicability of the FLSA exemption.

*Klinedinst v. Swift Inv., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001). Exemptions to the FLSA "are to be narrowly construed against the employer who asserts them." *Jeffery v. Sarasota White Sox, Inc.*, 694 F.3d 590, 594 (11th Cir. 1995); *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997).

Under section 213(b)(1) of the FLSA, the overtime provision "shall not apply with respect to [ ] any employee with respect to whom the Secretary of Transportation ("the Secretary") has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). As a fellow district court has observed, "[t]he Department of Labor's jurisdiction under the FLSA and the Department of Transportation's jurisdiction under the Motor Carrier Act are mutually exclusive and there is no overlapping jurisdiction." *Morrison v. Quality Transports Servs., Inc.*, 474 F. Supp. 2d 1303, 1309 n.2 (S.D. Fla. 2007) (citing *Morris v. McComb*, 332 U.S. 422, 437-38 (1947)).

The applicable regulations explain that the Secretary of Transportation has the authority to establish maximum hours and qualifications of service for employees, and thereby trigger application of the motor carrier exemption, if two requirements are met: (1) an employee plaintiff must "be employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary's] jurisdiction" under the Motor Carrier Act; and (2) an employee plaintiff must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a). "In order to avoid any conflicts between these Acts, Congress decided that the Secretary of Transportation need not actually exercise his or her power to regulate under the Motor Carrier Act and that the FLSA's § 213(b)(1) exemption applies so long as the Secretary

has the authority to regulate over a particular category of employees." *Morrison*, 474 F. Supp. 2d at 1309 n.2. (citing *Spires v. Ben Hill County*, 980 F.2d 683, 686 (11th Cir. 1993)).

## V.  ANALYSIS

The Eleventh Circuit Court of Appeals, in *Mena v. McArthur Dairy,* 352 F. App'x . 303 (11th Cir. Sept. 22, 2009) ("*McArthur Dairy*"), upheld the dismissal of overtime pay claims brought under the FLSA in a case involving undisputed facts that are virtually identical to those now before this Court.  The facts in *McArthur Dairy* were that the plaintiff delivered perishable dairy products manufactured outside of Florida to retail outlets in Florida.  352 F. App'x 303. Even though these products were temporarily stored in a Miami warehouse, the Eleventh Circuit found that the products delivered by the plaintiff were part of "the practical continuity of movement across state lines" and, therefore, the Motor Carrier Act Exemption applied, requiring that summary judgment be granted in favor of the employer.  *Id.*  The Eleventh Circuit emphasized that—in determining the "practical continuity of movement across state lines"—a "critical factor" is the "fixed and persistent intent of the shipper at the time of shipping the product." *McArthur Dairy,* 352 F. App'x. at 304.  Given the facts of the instant case, and in particular Rich's utilization of forecast activities clearly showing "a fixed and persistent intent" by Rich to ship only as much product to the Burris Facility as needed to meet customer demand and to avoid spoilage of the subject products, the Court finds no reason why it should not apply the reasoning used by the Eleventh Circuit in *McArthur Dairy* and find that Rich is entitled to the entry of final judgment.[3]

---

[3]  Contrary to Plaintiffs' assertion that the Court should rely on the unpublished "Report and Recommendation" issued in *Harris v. Performance Transp., LLC*, No. 8:14-cv-2913-T-23AAS, 2016 WL 7666177 (M.D. Fla. July 11, 2016), the Eleventh Circuit's decision in *McArthur Dairy*, regardless of being unpublished, is controlling law here under the rules of citation. Furthermore, the facts of *Harris* are distinguishable from those now before this Court because the evidence in *Harris* showed that not all of the goods were shipped from out of state.

It is beyond dispute that the first requirement for the Motor Carrier Exemption—that Defendant is a carrier whose transportation of cargo is subject to the Secretary's jurisdiction under the Motor Carrier Act—is met here inasmuch as the Secretary not only has the power to exercise jurisdiction over Rich, but it has in fact exercised such jurisdiction. The record evidence shows that Rich is registered with the DOT, that Rich's trucks and drivers have been the subject of DOT inspection, that Rich requires its drivers to submit to, and comply with, DOT regulations, and that Rich maintains records as required by DOT regulations. Plaintiffs, therefore, clearly were employed by a carrier that is subject to the jurisdiction of the Secretary of Transportation. *McArthur Dairy,* 352 F. App'x at 306 (holding that the DOT has authority to exercise power where the employer is registered with the DOT, maintains the records required by DOT and the employer's trucks and drivers have been inspected and subjected to regulation by DOT). *Accord, Baez v. Wells Fargo*, 938 F.2d 180, 182 (11th Cir. 1991); *Walters v. American Coach Lines of Miami, Inc.*, 569 F. Supp. 2d 1270, 1274 (S.D. Fla. 2008); *Morrison*, 474 F. Supp. 2d at 1309.

Having determined that Defendant is a carrier whose transportation of property is subject to the Secretary's jurisdiction under the Motor Carrier Act, the Court must next determine whether, as a matter of law, Plaintiff engaged in activities of a character directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act, or whether there are genuine issues of material fact that preclude such a determination by the Court at this stage in the litigation. It is undisputed that Plaintiffs were responsible for driving trucks weighing over 10,000 pounds and that they operated these trucks on public highways. Obviously, these are the kinds of activities that clearly affect highway safety as contemplated by the Motor Carrier Act. *Alvarado v. I.G.W.T. Delivery Sys., Inc.*, 410

F. Supp. 2d 1272, 1277 (S.D. Fla. 2006) (there is little question that—as delivery truck drivers—plaintiffs' activities directly affected the safety of motor vehicle operation in interstate commerce).

It is also undisputed, however, that Plaintiffs' job activities took place wholly within the state of Florida. Nonetheless, for purposes of the Motor Carrier Act, "purely intrastate transportation can constitute part of interstate commerce if it is part of a 'continuous stream of interstate travel.' For this to be the case, there must be a 'practical continuity of movement' between the intrastate segment and the overall interstate flow." *McArthur Dairy*, 352 F. App'x at 306 (citing *Walters,* 575 F.3d at 1229 (citations omitted)). A critical factor in determining the shipment's essential character is the shipper's "fixed and persisting intent" drawn from all the facts and circumstances at the time of the shipment. 29 C.F.R. § 782.7(b)(2); *see also*, *McArthur Dairy*, 352 F. App'x at 306 (citing *Bilyou v. Dutchess Beer Distribs., Inc.,* 300 F.3d 217, 223–24 (2d Cir. 2002)). The regulations provide the following persuasive guidance on this issue:

> If ... [a fixed and persisting] intent is present, the interstate character of the traffic is not changed simply because the merchandise may move through a warehouse ... on the way to its ultimate destination. Where a ... warehouse serves only as temporary storage to permit orderly and convenient transfer of goods in the course of what the shipper intends to be a continuous movement to destination, the continuity of the movement is not broken at the warehouse. Whether the shipper has a "fixed and persisting intent" that the merchandise continue in interstate ... commerce from or to an out-of-State origin or destination, via a warehouse ... is ascertained from all the facts and circumstances surrounding the transportation.
>
> In this regard, ... [some] factors [that] have been considered in establishing that the [intrastate] ... transportation component is part of a continuing movement in interstate commerce [are the following:] .... [1] Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped through the warehouse on projections of

> customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. The factual basis for projecting customer demand may include, but is not limited to, historic sales in the State, actual present orders, [and] relevant market surveys of need. [2] No processing or substantial product modification of substance occurs at the warehouse[.] ... [3] Modern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse ....
>
> Conversely, the presence of one or more of the following factors is not sufficient to establish a break in that continuity that would change the interstate character of the subsequent transportation. [1] The shipper's lack of knowledge of the specific, ultimate destination or consignee at the time the shipment leaves its out-of-State origin[.] ... [2] Routing of the outbound shipment by the warehouse .... [3] Use of a warehouse not owned by the shipper.

*Motor Carrier Interstate Transportation—From Out-of-State Through Warehouses to Points in Same State*, 57 FR 19812–01, 1992 WL 93608 (May 8, 1992).

    This Court is persuaded, after applying the same analysis used by the Eleventh Circuit in *McArthur Dairy*, that Rich's fixed and persistent intent was present and that Plaintiffs' transportation of the subject products was part of the "practical continuity of movement" across state lines, thereby constituting interstate commerce. The record shows that the products transported by Plaintiffs were previously manufactured in other states by Rich. (Barnes Aff., Ex. 1, ¶ 4). Unlike in *McArthur Dairy*, where "much" of the product was manufactured elsewhere, none of Rich's subject products are manufactured or originate in Florida. (Wolf Aff., Ex. 2, ¶ 16; *See also,* Ehrlich Dep., Ex. 3, p. 45, ln. 1–11; Prusinski Dep., Ex. 4 at p. 31, lns. 1–11; Reale Dep., Ex. 5, p. 48, lns. 1–5). Also, while the defendant in *McArthur Dairy* apparently owned the warehouse where its subject products were temporarily stored, Rich controls its products while they are stored at the Burris Facility pursuant to its contract with the Burris Facility regarding the handling, release and transfer of it products from Burris to the RSRs for distribution. (Smith

Dep., Ex. 8, p. 5, ln. 1 to p. 6, ln. 1; p. 13, ln. 19 to p. 14, ln. 2; p. 34, ln. 14 to p. 36, ln. 24). Thus, there is no distinction between this case and *McArthur Dairy* as to continuing control over these products by Rich.

As in *McArthur Dairy*, the subject products stored at Burris are pre-packaged and not modified once they reach the Burris facility. (Ehrlich Dep., Ex. 3, p. 44, lns. 14–19 and p. 45, ln.13 to p. 46, ln. 1; Prusinski Dep., Ex. 4, p. 34, ln. 18 to p. 35, ln. 12). The products transported to Burris are perishable and usually of a relatively short shelf life. (Ehrlich Dep., Ex. 3, p. 19, ln. 25 to p. 20, ln. 1; Prusinski Dep., Ex. 4, p. 32, ln. 23 to p. 33, ln. 12; p. 33, 1ns, 13–22; Reale Dep., Ex. 5, p. 21, lns. 1–7; p. 21, lns. 8–12). Additionally, any "out of date" or "distressed products" are either disposed of or sold as distressed product to prisons or food banks and are never transported by the Burris shuttles from the Burris facility to the RSRs' delivery trucks. (Smith Dep., Ex. 8, p. 14, lns. 3 to 20).

Finally, just as in *McArthur Dairy*, the quantity of products placed in interstate commerce by Rich are measured so as to meet to the needs of the customers to whom the RSRs deliver the products. Rich's quantities are calculated by customers' past purchases. More specifically, Rich employs a Demand Planner who forecasts future sales for the long term (for two years going forward) and adjusts these forecasts for the short term (month-to-month) with review of the projections every day in order to ensure as much accuracy as possible and provide "real-time" forecasts. (Barnes Aff., Ex. 1, ¶ 8; Barnes Dep., Ex. 9, p. 6, lns. 4–11; p. 8, ln. 1 to p. 11, ln. 23; and p. 13, ln. 17 to p. 15, ln. 20; p. 16, ln. 6 to p. 17, ln. 12; p. 18, ln. 10 to p. 21, ln. 9; p. 22, ln. 6 to ln. 23; p. 23, ln. 10 to p. 24, ln. 2; p. 24, ln. 12 to p. 26, ln. 19; p. 27, ln. 20 to p. 28, ln. 6). The forecasts take into account the historical demand of customers as well as current developments including weather events, store promotions, store losses and closings and

numerous other factors. (*Id.*). Rich's objective here is to ensure that the quantity of the subject products shipped to Burris is sufficient to meet customer needs, but not so much that it will incur a loss due to the perishable nature of the subject products. (*Id.*).

As was the case in *McArthur Dairy*, Rich's trucks are not merely randomly stocked with a variety of product, but instead, the RSRs place orders based on specific customer needs. *See McArthur Dairy,* 352 F. App'x. at 5 n.3. Shipments of the subject products to the Burris Facility occur typically twice a week, the space rented at the Burris Facility by Rich is never full, and at least two trucks are sent each week because the product replenishment will not fit into one truck. (K. Wolf Dep., Ex. 10, p. 17, lns. 6–11; p. 18, lns. 8–20; p. 19, lns. 5– 8).

Although Plaintiffs assert that Rich's decision in 2016 to reclassify the RSRs and to begin paying them overtime creates a disputed issue of fact as to the applicability of the Motor Carrier Act Exemption, courts have uniformly held that the reclassification of employees or the decision to pay employees overtime "is not materially relevant to the determination of whether [the employees] fall within" the exemption being claimed by the employer. *Clarke v. JPMorgan Chase Bank,* No. 08 Civ. 2400, WL 1379778 (CM)(DCF), at *22 (S.D.N.Y. Mar. 26, 2010); *see, Pippins v. KPMG LLP,* 921 F. Supp. 2d 26, 54–55 (S.D.N.Y. 2012) (holding that even when at one time the employer thought an employee was non-exempt, this is not relevant to determining an employee's exempt status under the prior policy); *see also*, *Birdsong v. AT&T Corp.*, No. C12-6175 THE, 2013 WL 1120783, at *10 (N.D. Ca. Mar. 18, 2013) (holding that reclassification, without more, is insufficient to establish that an employee was misclassified before the reclassification). Therefore, the only issue for this Court is whether Rich has met its burden to demonstrate that the Motor Carrier Act Exemption applies—which it has done by reason of the undisputed facts.

## VI.  CONCLUSION

Because Rich established both elements of the Motor Carrier Exemption, Plaintiffs cannot avail themselves of the benefits of the FLSA overtime pay provision in 29 U.S.C. § 207(a)(1).

**ACCORDINGLY**, it is **ORDERED AND ADJUDGED**:

Defendant's Motion for Summary Judgment (Doc. 45) is **GRANTED**.  The Clerk is directed to enter judgment in favor of Defendant, terminate any pending motions and **CLOSE** this case.

**DONE AND ORDERED** at Tampa, Florida, this 1st day of May, 2018.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

**Copies provided to:**
Counsel of record